UNITED STATES of America,
Plaintiff–Appellant,

v.

Julius BARRY, Defendant–Appellee.

No. 88–4174.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 4, 1989.

Decided Nov. 2, 1989.

Stephen H. Jigger, Robert J. Becker, U.S. Dept. of Justice, Cleveland, Ohio, Joseph Douglas Wilson (argued), Dept. of Justice, Criminal Div., Appellate Section, Washington, D.C., for plaintiff-appellant.

Fritz Byers (argued), Toledo, Ohio, for defendant-appellee.

Before KRUPANSKY and RYAN, Circuit Judges; and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

■  This appeal requires us to construe the language of the Travel Act, 18 U.S.C. § 1952, which states "[w]hoever ... uses any facility in interstate or foreign commerce, including the mail, with intent to" commit or further unlawful activities, shall be fined or imprisoned, or both. The specific question is whether the statute makes purely intrastate use of the mail in furtherance of an unlawful activity a federal crime. The district court held that § 1952 does not criminalize purely intrastate use of the mail and dismissed the Travel Act count of an indictment. The government appeals, and we affirm.

I.

A.

Congress enacted the Travel Act in 1961 as part of Attorney General Robert Kennedy's program to curb organized crime and racketeering. In relevant part the Act provides:

Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises

(a) Whoever travels in interstate of foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of unlawful activity ... shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

As we point out below in our discussion of the legislative history of the Act, the language employed in the version of the Act finally adopted is significantly different from that originally proposed. Also, the text of the Act extends its coverage far beyond that indicated by its title. The Act criminalizes activities not usually included with the words "travel" and "transportation." This expansion occurred in response to perceived shortcomings of the original proposal, but there is no indication that the

expansion was intended to cover purely intrastate activities.

### B.

A grand jury in the Northern District of Ohio returned a two-count indictment against the defendant, Julius Barry. The second count charged that Barry used "a facility in interstate commerce, to wit, the mail," with intent to distribute the proceeds of an unlawful gambling enterprise in violation of 18 U.S.C. § 1952(a)(1). Prior to trial the parties stipulated that the only evidence under the Travel Act count would be that Barry mailed two letters from Toledo, Ohio to "Billy" Scott in Columbus, Ohio.

In granting Barry's motion to dismiss the Travel Act count, the district court found no ambiguity in the statutory language—holding that it covered only interstate mailings—and concluded that it was not necessary to consider the Act's legislative history. In making this determination the court specifically rejected the reasoning and conclusion of the Second Circuit in *United States v. Riccardelli*, 794 F.2d 829 (2d Cir.1986). The *Riccardelli* court, relying on legislative history to resolve a perceived ambiguity, held that a purely intrastate mailing was sufficient for a prosecution under the Act.

### II.

We do not find the meaning of "including the mail," as used in the Travel Act, to be absolutely clear. Accordingly, we will consider the legislative history and stated purpose of the originally proposed bill in arriving at a construction of this language.

### A.

The legislation now codified as 18 U.S.C. § 1952 was filed in the Senate as S. 1653. In its original form the bill criminalized only travel between states for the purpose of promoting or facilitating certain unlawful "business" enterprises. 107 Cong.Rec. 13,942–43 (1961). Members of the Senate Judiciary Committee, particularly Senator Keating of New York, felt that the aim of the bill was too narrow. They argued that members of organized crime, the principal targets of the bill, would simply shift their means of promoting illegal activities from interstate travel to the use of other interstate facilities. In a report to the Senate, the Judiciary Committee approved an amendment to S. 1653 to broaden its scope. The report recommended that the bill be passed with an amendment to add a new section 2, which stated that "[w]hoever uses any facility for transportation in interstate or foreign commerce, including the mail, with intent to" accomplish the purposes proscribed in the original bill would be subject to the same punishments. S.Rep. No. 644, 87th Cong., 1st Sess. 1 (1961). The report stated that the purpose of this amendment, which Senator Keating proposed, was "to bring within the provisions of the bill the use of any facility for transportation in interstate ... commerce, including the mail...." *Id.* at 2.

The Senate adopted the committee's amendment and sent it to the House of Representatives. In addition to other amendments, the House combined sections 1 and 2 into a single section, which appears now as 18 U.S.C. § 1952(a). The report of the House Judiciary Committee, forwarding the amended bill to the House, stated that "the amendment combines into one section sections 1 and 2 of the bill as it was passed by the Senate but makes no substantive change in the provisions of the bill." H.R.Rep. No. 966, 87th Cong., 1st Sess. 2, *reprinted in* 1961 U.S.Code Cong. & Admin.News 2664.

When the two chambers continued to disagree, S. 1653 was sent to conference. The Conference Committee agreed on the House version, and this version became the Travel Act. See H.R.Rep. No. 1161 (Conference Report), 87th Cong., 1st Sess. 1 (1961). The disagreement that led to a conference principally concerned the treatment of "unlawful activit[ies]." *Id.* at 2. The statement of the House managers recommending the conference version also treated the decision to combine the two sections in the Senate bill into a single section as creating no substantive change. *Id.*

## B.

In addition to the legislative history examined above, the parties rely on various statements made during consideration of S. 1653, particularly those of Senator Keating and Attorney General Kennedy. Senator Keating consistently pressed for a broader act to fight organized crime. In fact, he had introduced an earlier anti-organized crime bill based upon a conspiracy approach (S. 710). The bill prohibited conspiracies "to commit any organized crime offense" and required proof of one or more overt acts to effect the object of the conspiracy. Under the Keating bill, a conspirator committed an overt act if he

> deliver[ed] for shipment or transport[ed] in interstate commerce any article, *or* deposit[ed] in the mail or [sent] *or* deliver[ed] by mail any letter, package, ... or transmit[ted] or cause[d] to be transmitted in interstate commerce any message or communication by wire or radio....

*The Attorney General's Program to Curb Organized Crime and Racketeering Before the Senate Committee on the Judiciary,* 87th Cong., 1st Sess. 95 (1961) (hereafter Senate Hearing) (emphasis added).

S. 710 would have criminalized the mere depositing of material in the mail within the framework of a conspiracy regardless of the material's subsequent movements. Use of the disjunctive "or" makes this meaning clear. Throughout the hearing on S. 1653 Senator Keating continued to press for a broader bill. He was particularly insistent that use of the mail be included. In proposing the addition of section 2 to S. 1653, however, he appears to have settled for a more restricted coverage than he had proposed in S. 710. Whereas amended S. 1653 required use of a facility for transportation in interstate commerce, including the mail, S. 710 forbade the mere deposit of materials in the mail *or* movement of materials in the mail to further organized crime. Senator Keating's statement during floor discussion of amended S. 1653 that the bill "assures a combined effort against all those in our midst *who cross State lines* in attempting to carry out their defiance of the law" supports the view that he settled

for a narrower scope in S. 1653. 107 Cong. Rec. 13,943 (1961) (emphasis added).

## C.

There was concern in Congress that with the Attorney General's approach to fighting organized crime, the federal government might intrude into traditional areas of local law enforcement. In testimony at the Senate hearing Mr. Kennedy responded to this concern by stating that the administration did not seek "to preempt the field of enforcement or interfere in any way with the traditional responsibilities of local law enforcement." Senate Hearing at 11. Referring specifically to S. 1653, which was part of a large package of proposed bills, the Attorney General stated: "Our investigations also have made it quite clear that only the Federal Government can shut off the funds which permit the top men of organized crime to live far from the scene and, therefore, remain immune from the local officials." *Id.* at 16.

This testimony, with its emphasis on the interstate character of organized crime activity, is consistent with statements in the Attorney General's earlier letter transmitting the proposed legislation to the Senate and House:

> Over the years an ever-increasing portion of our national resources has been diverted into illicit channels. Because many rackets are conducted by highly organized syndicates whose influence extends over State and National borders, the Federal Government should come to the aid of local law enforcement authorities in an effort to stem such activity.

> The bill which I submit to the Congress would impose criminal sanctions upon the person whose work takes him across State or National boundaries in aid of certain "unlawful activities."

> \*　\*　\*　\*　\*　\*

> The effect of this legislation would be to impede the clandestine flow of profits from criminal ventures and to bring about a serious disruption in the far-flung organization and management of coordinated criminal enterprises. It would thus be of material assistance to

the States in combatting pernicious undertakings which cross State lines.

Letter dated April 6, 1961, appended to S.Rep. No. 644 at 4 and H.R.Rep. No. 966 at 4. Given the expressed concern over federal encroachment on local law enforcement, it seems unlikely that Congress would have adopted S. 1653 with the intention of making federal crimes of intrastate activities that local authorities could prosecute adequately.

### III.

We are not concerned with whether Congress has the power to criminalize an intrastate use of the mail. The Constitution grants Congress plenary authority over the postal system. U.S. Const. art. I, § 8. The only question is whether Congress, in enacting the Travel Act, chose to limit the prohibited use of the mail to interstate mailings.

We have examined other federal criminal statutes that refer to interstate commerce facilities—particularly the mail—but can discern no clear, consistent use of phraseology that would argue one way or the other with respect to the Travel Act. The Interstate Incitement of Riot Act, 18 U.S.C. § 2101, is similar in structure to the Travel Act:

> Whoever travels in interstate or foreign commerce or uses any facility of interstate commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent—

18 U.S.C. § 2101(a)(1). Obvious differences between § 1952 and § 2101 are use of the word "of" rather than "in" to describe the facilities whose use is prohibited, and the listing of other communications facilities along with the mail. When comparing the two statutes, it appears that Congress merely sought to make it clear in both instances that the mail is one of the included facilities. We attach no significance to the fact that § 1952 singles out the mail only while § 2101 includes it in a more detailed listing.

▇ We are not aware of any decision determining the reach of § 2101. The defendant argues that the use of the preposi-

tion "of" is significant. By this choice, he argues, Congress made clear that any use of the listed facilities with intent to commit prohibited acts is punishable. According to this argument, the word "of" identifies the facilities referred to—those facilities that can be used "in interstate commerce"—and does not require a particular use of such facilities. The word "in," on the other hand, does require a particular use of a facility—a use that crosses state lines. We have recognized the significance of this same choice of words in a civil action for damages under federal securities laws. See *Aquionics Acceptance Corporation v. Kollar*, 503 F.2d 1225 (6th Cir.1974) (15 U.S.C. § 78j(b), which refers to "the use of any means or instrumentality of interstate commerce or of the mails," reaches any use of the designated means or instrumentalities, not just their interstate use). In *Aquionics*, we stated:

> It is significant that both the statute and the rule speak in terms of an "instrumentality *of* interstate commerce" (emphasis added) rather than an instrumentality *in* interstate commerce.

*Id.* at 1228. Applying the same reasoning, we may conclude that a statute that speaks in terms of an instrumentality *in* interstate commerce rather than an instrumentality *of* interstate commerce is intended to apply to interstate activities only. This reasoning produces a construction congruent with the purpose of the Travel Act—to fight the interstate activities of organized crime—which is apparent from the legislative history discussed in Part II.

### IV.

#### A.

In *United States v. Riccardelli*, 794 F.2d 829 (1986), the Second Circuit emphasized the historic importance of the postal system in unifying the country and the fact that the postal establishment is recognized as an "exclusively federal instrumentality." *Id.* at 831. The court found that "[a] plain reading of the Travel Act ... reveals no indication that the mailing referred to therein need be interstate to invoke federal

jurisdiction." *Id.* Explaining its "plain reading," the court continued:

> The positioning of the phrase "including the mail" in the statute singles out the mails for special treatment and thus, consistent with the historical understanding of the United States mails, equates the use of the mails with the use of other facilities of interstate and foreign commerce; it does not indicate that the mailing itself must be interstate. A review of the legislative history of the Travel Act supports this reading of the statute.

*Id.*

Although it found the meaning to be plain, the court examined the legislative history and found, in approximately 700 pages of testimony before House and Senate committees, "not the slightest indication that Congress intended that use of the mails be interstate before federal jurisdiction is invoked." *Id.* at 832. No other court of appeals has decided the precise issue. We are reluctant to disagree with the distinguished panel of a sister circuit. Nevertheless, our study of the issue leads us to a conclusion opposite to that of the *Riccardelli* court. As indicated earlier, we find the meaning of § 1952(a) unclear. Further, while it *does not point ineluctably* to our conclusion, the legislative history of S. 1653 suggests a congressional intent in enacting the Travel Act to criminalize interstate activities only. Although Congress expanded the reach of the Act during its passage through the judiciary committees to include more than travel, Congress never stated or indicated an intention to include purely intrastate activities within its ambit. The effect of the expansion was to proscribe, in addition to interstate travel, interstate use of other facilities, including the mail, for illegal purposes. Further, we attach no significance to the positioning of the phrase "including the mail." There is no indication that Congress intended the mail to be treated differently than other interstate facilities. If the Judiciary Committee had intended to cover only interstate travel and interstate use of other facilities, but all uses of the mail, the logical wording of the amendment to S. 1653 would have been "use of facilities in interstate commerce *or the mail.*" This conclusion is bolstered by Senator Keating's stated concern that a prohibition against interstate *travel* alone would not cripple organized crime sufficiently. Simply in order to close a loophole, he proposed the specific reference to the mail in section 2 of S. 1653.

### B.

■ Two recognized principles of statutory construction support our conclusion. First, we apply the rule of lenity. As the Supreme Court stated in a case concerning the very statute now before us, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). The defendant in *Rewis* operated a numbers game in a small town in Florida located a few miles from the Georgia–Florida state line. The district court instructed the jury that if bettors traveled interstate for the purpose of gambling at the defendants' game, the defendants violated the Travel Act. The court of appeals affirmed the defendants' convictions, holding that the defendants were responsible for the interstate travel of their customers. In reversing, the Supreme Court examined the legislative history of § 1952 and concluded that it was "aimed primarily at organized crime, and more specifically, at persons who reside in one State while operating or managing illegal activities located in another." *Id.* at 811, 91 S.Ct. at 1059. In a footnote that we have omitted, the Court quoted from Attorney General Kennedy's testimony concerning the purpose of S. 1653. This discussion involved the second principle that we apply: the "cardinal canon of statutory construction that statutes should be interpreted harmoniously with their dominant legislative purpose." *Spilker v. Shayne Laboratories, Inc.,* 520 F.2d 523, 525 (9th Cir.1975). The Attorney General emphasized repeatedly the interstate character of the problem and the House and Senate reports alluded to his testimony and that of others highlighting the same aspect of organized crime activities. Our con-

struction harmonizes with the dominant purpose of Congress in enacting § 1952.

The judgment of the district court is affirmed.