ADDINGTON MINING, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 94–464C.

United States Court of Federal Claims.

June 28, 1996.

Donald H. Vish, Louisville, Kentucky, for plaintiff.

Lauren S. Moore, Civil Division, Department of Justice, Washington, DC, with whom were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Assistant Director, for defendant. Glenda H. Owens and Joan R. Goldfarb, United States Department of the Interior, of counsel.

## OPINION

MARGOLIS, Judge.

This case involves the requirement that coal producers pay a reclamation fee of 35 cents for each ton of coal mined to the Department of Interior. Plaintiff, Addington Mining, Inc. ("Addington"), is a coal mining company which the Department of the Interior alleged had underestimated the amount of coal it produced from January 1, 1987 until December 31, 1992. As a result of this under reporting, defendant, the United States, ordered plaintiff to pay an additional $264,554 in reclamation fees, penalties, and interest. Plaintiff then filed suit seeking (1) a declaratory judgment setting its reclamation fee liability, (2) a refund for all reclamation fee overpayments and penalties, (3) a permanent

injunction barring the Office of Surface Mining Reclamation and Enforcement ("OSM") from attempting to collect further reclamation fees, interest and penalties, and (4) a permanent injunction barring OSM from permit blocking Addington as a result of its alleged underpayment of reclamation fees. Defendant then filed a partial motion to dismiss and partial motion for judgment on the administrative record, claiming that this court lacks jurisdiction to hear Addington's claims for equitable relief, and that OSM's decision to disallow portions of plaintiff's excess moisture deduction as well as OSM's recalculation of the excess moisture deduction were neither arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. After a full briefing and oral argument, the court grants defendant's motions.

## FACTS

This case involves the computation of the excess moisture content of newly mined coal. One of the purposes of the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. §§ 1201–1328, is to promote the reclamation of mine lands. See 30 U.S.C. § 1201(h). In order to accomplish that goal, Congress created the Abandoned Mine Reclamation Fund, 30 U.S.C. §§ 1231–33, which requires coal mine operators to pay a 35 cent fee into the fund for each ton of coal produced. See 30 U.S.C. § 1232. In 1988, the Office of Surface Mining Reclamation and Enforcement ("OSM") promulgated a regulation that allowed operators, in calculating the tonnage of coal for which the reclamation fee must be paid, to "take a calculated weight reduction to allow for the weight of excess moisture in the coal" which is produced on or after July 1, 1988. 30 C.F.R. § 870.18. Excess moisture is defined by OSM as "the difference between total moisture[1] and inherent moisture[2]." 30 C.F.R. § 870.5. The excess moisture deduction, however, is subject to four regulatory requirements under 30 C.F.R. § 870.18. The operator must (1) "demonstrate through competent evidence that there is a reasonable basis for determining the existence and amount of excess moisture" and update the documentation as necessary to establish the continuing validity of the allowance, 30 C.F.R. § 870.18(a); (2) test inherent and total moisture using standard laboratory analyses, 30 C.F.R. § 870.18(b); (3) test for variations in inherent moisture amounts for different seams from which the coal is blended prior to sale, transfer or use, 30 C.F.R. § 870.18(c); and (4) retain documentation and laboratory analyses results for six years, 30 C.F.R. § 870.18(d).

Though OSM did not require a specific method for determining excess moisture, it did issue guidance through Abandoned Mine Land ("AML") payer letters, and ultimately compiled these letters into a handbook. See AML Payer Letter 88–1 (June 16, 1988); AML Payer Letter 88–3 (September 28, 1988); AML Payer Letter 90–2 (September 14, 1990); AML Payer Letter 92–2 (March 23, 1992); Office of Surface Mining, Reclamation and Enforcement Payer Handbook (1992) (Defendant's Appendix at 665). While not excluding other possible procedures, these AML payer letters and the subsequent handbook set out acceptable methods and procedures for calculating the excess moisture deductions. See id. If the operator followed these suggested methods, OSM stated that it would accept the resulting determination of the excess moisture. AML Payer Letter 88–1, at 2 (June 16, 1988). If the operator instead chose to use another method or procedure, "the operator [would have] to assume the burden of proving that such methods or procedures meet the requirements of 30 C.F.R. § 870.18." Id.

Plaintiff Addington chose not to follow OSM's guidance and instead used its own method to determine the excess moisture in coal from its 55 mines. Plaintiff determined that it produced 26,651,286.31 tons of coal, after the excess moisture deduction, from

---

**1.** Total moisture is "the moisture determined as the loss in weight in an air atmosphere under rigidly controlled conditions of temperature, time and air flow." 30 C.F.R. § 870.5.

**2.** Inherent moisture is the "moisture that exists as an integral part of the coal seam in its natural state, including water in pores, but not that present in macroscopically visible fractures." 30 C.F.R. § 870.5.

those mines between January 1, 1987 and December 31, 1992. Plaintiff then paid its reclamation fee, pursuant to 30 U.S.C. § 1232, based upon this reported weight.

On February 16, 1994, OSM issued the results of its audit of the 55 mines. The report determined that Addington had under reported the tonnage of coal by 531,487.49 tons. *See* Reclamation Fee Compliance Audit of Addington, Inc. for the Period January 1, 1987 through December 31, 1992 ("Audit"), at 6 (Defendant's Appendix at 13). The audit determined that the alleged under reporting resulted from three flaws in plaintiff's excess moisture deduction calculation: (1) excess moisture deductions were taken for coal produced prior to July 1, 1988; (2) inherent moisture tests were not conducted each month as required; and (3) one mine did not have any total moisture tests done for the quarter ending September 30, 1992. *See id.* at 7–8 (Defendant's Appendix at 14–15).

As a result of the determination that Addington had under reported its coal production, OSM billed plaintiff an additional $186,020.67 in reclamation fees, $43,396.02 in interest, and $35,137.04 in penalties, for a total of $267,056.73. Plaintiff paid under protest, and on May 11, 1994, filed suit in United States District Court for the Eastern District of Kentucky. On July 1, 1994 the parties moved to transfer the action to this court. On July 8, 1994 the district court transferred the case to this court. Plaintiff's complaint was filed in this court on September 8, 1994.

## DISCUSSION

At oral argument, plaintiff abandoned its claims for equitable relief. Therefore, defendant's partial motion to dismiss is granted. Plaintiff also now concedes the first and third audit deficiencies noted by OSM.

*Review of Agency Action Based on the Administrative Record*

Defendant asks that this court grant judgment for defendant on the second audit deficiency as well based on the administrative record. Defendant claims that since this case involves an allegation of arbitrary and capricious actions by a government agency, judicial review is limited to the administra-

tive record. To support its contention, defendant cites the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The APA, which codifies traditional principles governing judicial review of final agency decisions, states, "[t]he reviewing court shall ... (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. *See Citizens to Preserve Overton Park, Inc., v. Volpe,* 401 U.S. 402, 413–17, 91 S.Ct. 814, 822–24, 28 L.Ed.2d 136 (1971).

Plaintiff argues that the court should consider evidence outside the administrative record. Addington claims it has additional evidence, including an affidavit and report from an expert, which further support its contention that the OSM acted in an arbitrary and capricious manner.

The APA has been followed in this court as the "applicable standard for judicial review of agency action." *S & G Excavating, Inc. v. United States,* 15 Cl.Ct. 157, 161 (1988). Under the APA, an agency's actions are arbitrary, capricious, and an abuse of discretion to the extent the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). *See Citizens to Preserve Overton Park,* 401 U.S. at 415–16, 91 S.Ct. at 823–24; *S & G Excavating,* 15 Cl.Ct. at 161–62; 5 U.S.C. § 706(2)(A). To determine whether an agency action was "arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law ... the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823. *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

■ If the agency has articulated a reasonable basis for its decision and followed the necessary procedural requirements, the agency's decision is entitled to a presumption of regularity. *See Citizens to Preserve Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823. Therefore in APA-type challenges, review of an agency decision is based upon the administrative record. *Camp,* 411 U.S. at 142, 93 S.Ct. at 1244; *S & G Excavating,* 15 Cl.Ct. at 161. A reviewing court is not empowered to substitute its own judgment for that of the agency. *See Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823–24; *S & G Excavating,* 15 Cl.Ct. at 161.

If Addington wanted its expert's report and affidavit considered, it should have submitted these documents to OSM during the administrative process. *See Camp,* 411 U.S. at 142, 93 S.Ct. at 1244. To request consideration of them now is inappropriate.

*Reasonableness of OSM Disallowance of Addington's Moisture Calculation*

■ Addington disputes two decisions made by OSM that resulted in the disallowance of 531,487.49 tons of excess moisture deductions. Plaintiff first claims that OSM acted unreasonably when it determined that Addington had failed to demonstrate with competent evidence a reasonable basis for its excess moisture determination. Second, plaintiff argues that OSM's recalculation of the excess moisture was unreasonable. Plaintiff, however, has failed to show that OSM acted unreasonably in either instance.

The regulations implementing SMCRA prescribe that an operator such as Addington "shall demonstrate through competent evidence that there is a reasonable basis for determining the existence and amount of excess moisture." *See* 30 C.F.R. § 870.18(a). The Federal Register preamble to the regulation explains that, in order to demonstrate with competent evidence that there is a reasonable basis for the deduction, the operator must provide sufficient evidence establishing the existence and amount of the excess moisture to demonstrate that the inherent and total moisture figures are valid and were properly derived. *See* 53 Fed.Reg. 19,721–22 (May 27, 1988). Additionally, the operator must demonstrate that reasonable time frames were used to measure the excess moisture. *Id.* at 19,720.

The AML payer letters expressly state that they only contain guidance on calculating the deduction and fulfilling the competent evidence requirement, "[w]ithout excluding other possible procedures." AML Payer Letter 88–1, at 2 (June 16, 1988). The methods described in the letters are intended to offer safe harbor from potential audits for operators seeking to take the deduction. These letters state that an operator is free to disregard the guidance in the payer letters for calculating the excess moisture deduction, but in doing so the operator assumes "the burden of proving that such methods or procedures meet the requirements of 30 C.F.R. Section 870.18." *See id.* (emphasis omitted); AML Payer Letter 90–2, at 3 (September 14, 1990).

According to the OSM audit file, plaintiff's testing schedule deviated radically from the testing schedule set out in the AML payer letters. The AML payer letters suggest inherent moisture tests on each seam every month for the first 24 months of mining, and then annually. *See* AML Payer Letter 88–1, at 3 (June 16, 1988). Plaintiff, however, during the period 1988–92, chose just to perform approximately 50 inherent moisture tests of the 20 different seams. Moreover, only 15 of its 55 different mining operations were tested.

In its inherent moisture report, Addington attempted to explain why this radical departure from the suggested methods in the AML payer letters nonetheless fulfilled the statute's reasonableness requirement. *See* Defendant's Appendix, at 236–38. Plaintiff argued that testing every seam and split for 24 consecutive months was an unreasonable burden, and that instead an operator should be able to use a combination of local knowledge of coal seams, American Society for Testing and Materials ("ASTM") testing, and laboratory acknowledgement of seam consistencies to determine the amount of excess moisture present. Plaintiff further claimed that: 1) taking samples would require leaving the highwalls open longer than normal, which would conflict with the time requirements for reclaiming highwalls and the goal

of preventing toxic runoff; and 2) inherent moisture does not vary much within a coal field and remains generally constant over time.

Plaintiff has not demonstrated that its testing schedule was reasonable. First, Addington did not establish that testing each seam and each split would present an unreasonable financial burden. Though plaintiff claimed it would cost $100,000 to complete monthly testing, *see Inherent Moisture Report of Addington, Inc.,* at 3 (Defendant's Appendix at 238), defendant has shown that there are other methods of testing for moisture which the AML Payer Letters endorsed, such as tipple and equilibrium testing, which are of minimal cost. *See* ASTM D 1412. *See also* AML Payer Letter 88–1, at 3 (June 16, 1988); AML Payer Letter 90–2, at 3 (September 14, 1990). Additionally, operators regularly take samples of their extracted coal for other tests; thus, performing the inherent moisture test on the samples already taken may not therefore pose an unreasonable burden on the operator and also may not necessarily extend the length of time the highwall must be kept open. Further, if plaintiff is correct in claiming that the inherent moisture within a particular seam is relatively constant, plaintiff should have tested each seam at least once annually; plaintiff could then have applied each seam's test result to all the splits within the seam. Instead, plaintiff chose to test most of the 20 seams only once during the entire five-year period—without convincingly explaining why such minimal testing would be adequate.

Plaintiff has failed to show both why its method of testing was reasonable, and that OSM's decision to disallow plaintiff's calculation was unreasonable. OSM's decision to disallow Addington's calculation of excess moisture was neither arbitrary nor capricious, but was based on the appropriate factors as discussed in *S & G Excavating,* 15 Cl.Ct. at 161–62, and *Motor Vehicle Manufacturers Association,* 463 U.S. at 43, 103 S.Ct. at 2866–67, *supra.*

*Penalties*

■ Plaintiff also argues that, even if OSM acted reasonably in disallowing Addington's calculation of the excess moisture de-

duction, defendant unreasonably assessed a penalty for the fees which are more than 91 days overdue. Plaintiff, without citing any precedent for its position, states that a penalty should not be based upon a mere innocent failure to pay. Defendant claims that the SMCRA and its implementing regulations provide for the assessment of penalties, whenever the operator fails to pay the reclamation fees.

Under both the SMCRA and the Debt Collection Act of 1982, the Secretary of the Interior is empowered to promulgate regulations which provide a six percent annual penalty on all reclamation fees more than 91 days overdue. *See* 30 U.S.C. § 1242 (SMCRA); 31 U.S.C. § 3717(e)(2) (Debt Collection Act); 30 C.F.R. § 870.15(f). Nowhere in the language of either statute is there a provision limiting the applicability of the penalty. Further, though the applicability of the penalty provision has not been specifically addressed by previous courts, it has been applied without discussion in other reclamation fee cases. *See generally Cumberland Reclamation Co. v. Secretary, Department of Interior,* 925 F.2d 164, 165 (6th Cir.1991) (district court ordered coal operator to pay overdue reclamation fees, plus interest and penalties); *United States v. Manning Coal Corp.,* 977 F.2d 117, 119 (4th Cir.1992) (United States sued coal mining operator for interest, penalties and administrative costs for overdue reclamation fees). As a result, this court holds that OSM's application of the six percent penalty was reasonable.

*Reasonableness of OSM's Recalculation of Excess Moisture Deduction*

■ Plaintiff also claims that OSM's recalculation of the excess moisture deduction was arbitrary and capricious. The government argues that it acted reasonably in permitting Addington to retain part of the excess moisture deduction for the mines which had been tested.

Plaintiff has failed to demonstrate that OSM's recalculation was arbitrary and capricious. As discussed *supra,* an agency decision is arbitrary and capricious only if it "relied on factors which Congress has not

intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *S & G Excavating,* 15 Cl.Ct. at 161–62 (*citing Motor Vehicle Manufacturers Ass'n,* 463 U.S. at 43, 103 S.Ct. at 2867). Here, the agency had broad discretion to disallow Addington's entire excess moisture deduction for the months and mines for which Addington had failed to demonstrate a reasonable basis for its claim. *See* 30 C.F.R. § 870.18. Yet because some testing had been performed, OSM instead chose to grant part of Addington's excess moisture deductions, using OSM's own inherent moisture percentages for those months. *See* Audit, at 8 (Defendant's Appendix at 15). The court finds this action reasonably within OSM's authority. Therefore, defendant's partial motion for judgment on the administrative record is granted.

## CONCLUSION

For the foregoing reasons, this court finds for the defendant. This court lacks jurisdiction over plaintiff's claims for equitable relief. Further, review of OSM's actions is limited to the administrative record. Defendant did not act arbitrarily or capriciously in rejecting plaintiff's calculation of the excess moisture deduction. Defendant did not act arbitrarily or capriciously in recalculating plaintiff's excess moisture deduction. Defendant's partial motion to dismiss and partial motion for judgment on the administrative record are granted. The clerk shall enter judgment for the defendant. No costs.